UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| **ADAM DERBY** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:19-cv-02271-SRC |
| | ) |
| **RICHARD WISKUS, et al.,** | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF ADAM DERBY'S MOTION TO ENFORCE SETTLEMENT**

COMES NOW Plaintiff Adam Derby ("Derby"), by and through his undersigned counsel, and for his Motion to Enforce Settlement, states as follows:

1. The undersigned was appointed to represent Derby in this matter on June 29, 2022, in an order from this Court. Docket No. 73.

2. In the same order, the parties were required to mediate this matter in person at the Sex Offender Rehabilitation and Treatment Services Program ("SORTS") in Farmington, Missouri, not later than July 29, 2022. *Id.*

3. The parties mediated this matter in compliance with the Court's July 29, 2022, order, and were able to resolve 25 of Derby's requests at issue in his claims against Defendants under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). Docket No. 110, Joint Stipulation of Uncontested Facts, ¶ 21(a)-(q) (hereinafter "Joint Stipulation").

4. The reason the parties included them in the Joint Stipulation is that the undersigned was not comfortable entering into a settlement agreement with Defendants that could only be enforced in a breach of contract action in state court. Exhibit 1, Affidavit of Bryan

1

LeMoine ("LeMoine Affidavit"), at ¶ 9 and Attachment 1 (e-mails between Bryan LeMoine and counsel for Defendants, Cara Harris, dated August 4, 2022).

5. In an e-mail following mediation, the undersigned specifically stated as follows:

> I'll let you know what comes of my conversation with Mr. Derby, but I also have issues related to a release in this document. I don't want any ambiguity about his preservation of claims and also, quite frankly, am concerned about implementation of these accommodations. A release will make it hard for him to enforce the agreement since you are going to put him back into the grievance system instead of allowing him to enforce the agreement. That is problematic.

LeMoine Affidavit, at ¶ 9, Attachment 1.

6. There was therefore no ambiguity in our correspondence that the undersigned was concerned about the enforcement mechanism related to our resolution of 25 of Derby's claims.

7. The undersigned and counsel for Defendants had numerous conversations in terms of how to resolve this matter, and ultimately agreed at opposing counsel's suggestion that the parties would file a Joint Stipulation with the Court that would document the settlement of 25 of the claims and leave open 5 remaining claims for trial. *Id.* at 11.

8. Defendants' counsel provided correspondence to the undersigned indicating that her client was reviewing the Joint Stipulation. LeMoine Affidavit, at ¶¶ 13-14, Attachment 2.

9. The undersigned did not receive approval on the Joint Stipulation until the day it was due; however, it is undisputed that Defendants agreed to file a joint stipulation to be included in the Court's judgment and order consenting to certain relief on 17 of Derby's claims. *Id.* at 14.

10. The undersigned specifically discussed this fact with counsel for Defendants, Ms. Harris, during phone calls and a Webex meeting. LeMoine Affidavit, at ¶ 11.

11. Derby submits that experienced trial counsel as well as the general counsel for the Department of Mental Health knew that stipulating to the resolution of 17 of Derby's claims in a

joint filing would necessarily mean that the resolution of those claims would be included in the Court's order.

12. The parties continued to engage in settlement discussions following the filing of the Joint Stipulation until shortly before trial, but could not agree on how to resolve the last 5 of Derby's claims prior to the commencement of trial. *Id.* at ¶ 16.

13. During trial, however, following the close of evidence, the Court asked the parties' counsel to adjourn and meet in chambers, where the Court encouraged the parties to attempt to settle the matter before or after closing arguments. *Id.* at ¶ 17.

14. At some point, counsel for the parties met and the undersigned communicated substantially the same settlement offer that the undersigned communicated to counsel for Defendants on September 9, 2022, with the inclusion of a specific amount requested for attorneys' fees. *Id.* at ¶ 18.

15. Thereafter, counsel for Defendants requested the Court continue closing arguments until 10 a.m. on September 27, 2022, so that Defendants could confer with decision makers and attempt to resolve this matter. *Id.* at ¶ 19.

16. On September 27, 2022, the parties re-convened and continued settlement discussions. *Id.* at ¶ 20.

17. However, counsel (Ms. Harris and Ms. Ray) communicated that the Defendants were not willing to agree to pay any amount of money for attorneys' fees. *Id.* at ¶ 21.

18. The undersigned discussed this issue with counsel for Defendants, and all agreed that the undersigned could seek attorneys' fees from the Court. *Id.* at ¶ 22.

19. Eighth Circuit law is clear that a party cannot be prevailing absent issuance of an order from the court awarding some relief, even through a consent decree, and continued jurisdiction by the court over the order to enforce it.

20. Thereafter, the parties continued to negotiate a settlement, knowing that the Defendants were refusing to agree to pay any attorneys' fees and knowing that Derby intended on filing a motion seeking payment of such fees. *Id.* at ¶ 24.

21. The Court requested that counsel for Defendants meet in chambers to discuss settlement efforts. *Id.* at ¶ 25.

22. The undersigned, counsel for Defendants, and the Court discussed the fact that the parties were very close on settlement, but that Derby wished to resolve the matter in a way to allow him to seek attorneys' fees. *Id.* at ¶ 26.

23. The undersigned was concerned that a consent order from the Court may not provide a basis for prevailing party attorneys fees, but also expressed to the Court that if Derby was able to obtain more relief than he might otherwise obtain given the uncertainty of the results of the trial, the undersigned was willing to recommend the settlement to Derby and request payment of whatever fees were available from the Court. *Id.* at ¶ 27.

24. At no time after the trial began, however, did the undersigned discuss that the parties would enter into a private settlement agreement enforceable by Derby through a state court breach of contract action. *Id.* at ¶¶ 28-29.

25. Rather, as the Court noted on the record, the settlement was to be stated on the record and would become part of an enforceable court order. *Id.* at ¶ 30.

26. The undersigned would voluntarily agree to stay on as counsel for Derby and would be paid for such post-judgment or post-dismissal fees out of the Court's funds up to a limit of $5,000.00. *Id.* at ¶ 31.

27. As the Court stated on the record, the only reason for the discussion in chambers regarding the undersigned's continued service to Derby and the Court's supervision of the settlement was because it would be embodied within a consent order or judgment. *Id.* at ¶ 32.

28. Given the joint stipulation filed by the parties related to the settlement reached at mediation as to 25 of Derby's requests, it strains credulity that Defendants did not understand that the settlement would be embodied in a consent decree or judgment that would thereafter be subject to the Court's continuing enforcement authority over its orders and judgments.

29. Given the Department of Mental Health's own statement to the court that she has substantial experience in federal practice and her apparent substantial involvement in all negotiations on behalf of Defendants, and given that Defendants specifically agreed to the Joint Stipulation previously, it is difficult to believe that the Defendants did not agree to that same resolution for the remaining issues in the case, particularly where it was abundantly clear that Derby wanted to seek attorneys' fees as a prevailing party.

30. In fact, after the meeting in chambers, the undersigned spoke to counsel for Defendants one last time to discuss two outstanding issues in the settlement. *Id.* at ¶ 34.

31. Following that discussion, the undersigned discussed the settlement with Derby, who agreed to the settlement terms only because he understood that the Court would continue to retain jurisdiction to enforce the settlement and because the undersigned agreed to stay on as his counsel for purposes of enforcing the settlement. *Id.* at ¶ 35.

32. Given Derby's testimony during trial that, despite the existence of the joint stipulation, many of the agreed-upon accommodations had not been implemented by Defendants after the mediation or before the trial, the undersigned's and Derby's concerns about enforcement of the settlement were not unfounded.

33. These concerns had been specifically stated to Defendants' counsel prior to trial.

34. After Derby reluctantly agreed to the settlement (and did so only due to the continued jurisdiction of the Court and the undersigned's willingness to stay on as counsel for enforcement purposes), the undersigned informed counsel for Defendants that Derby had agreed to the settlement terms, and informed the clerk that the parties would put on the record the terms of the settlement. *Id.* at ¶¶ 36-27.

35. The terms of the agreed-upon settlement were that the parties would jointly stipulate to the following relief related to Mr. Derby's five remaining requests related to the exercise of this Wiccan faith that were the subject of trial:

a. Defendants would cause SORTS to revert back to its prior policy related to Mr. Derby's ability to go outside using his yard pass, which was that he was allowed to go outside unsupervised in accordance with his yard pass requirements subject to the nurse's discretion to prevent him from going outside due to severe weather or inappropriate dress.

b. Defendants would cause SORTS to obtain some amount of three of four religious oils approved by Defendants for the Wiccan's corporate locker/cabinet/tote to be in the custody of the nurse at SORTS. Mr. Derby could go to the nurse to obtain a drop of the oils to use for cleansing himself prior to performing personal or individual ritual.

6

    c. Defendants would cause SORTS to allow Mr. Derby to paint his face using SORTS-approved makeup during two corporate Wiccan services per year. The makeup would have to be applied and removed outside and Mr. Derby would receive no additional time to put on or remove makeup. Mr. Derby would have to apply his own makeup and could not apply another SORTS' resident's makeup. The makeup could be purchased by the Wiccan group using their budget. No mirror would be provided to the Wiccan's for application of the makeup. The makeup would remain in the Wiccan's corporate locker/cabinet/tote.

    d. Defendants would cause SORTS to allow Mr. Derby to obtain books to be kept in the Wiccan's corporate locker/cabinet/tote (which books cannot be checked out) which would teach Mr. Derby a foreign language. Mr. Derby could only use the books during corporate religious services and could only speak foreign languages during corporate religious services.

    e. Defendants could cause SORTS to allow Mr. Derby to obtain a tarot deck of his choosing and substitute cards within the tarot deck containing nude images with other cards that did not contain nude images. SORTS agreed that it would purchase said decks and approve the substituted tarot cards in the deck that Mr. Derby requested.

    f. Mr. Derby retained the right to seek prevailing party attorneys' fees, I would stay on as counsel for Mr. Derby for enforcement purposes, the settlement would be embodied in a Court order, and the Court would retain jurisdiction for enforcement purposes.

(LeMoine Affidavit, at ¶ 40).

    36.    Notably, this settlement was the product of extensive negotiations and Derby gave up several key items that were important to him. Namely, Derby understood that Defendants

7

were refusing to redact any images or content from books ordered for any purpose, would not provide audio CDs to aid him in the learning of foreign languages, and would not provide him a mirror or other reflective item to enable him to better apply makeup. *Id.* at ¶¶ 41-42.

37. But Derby was willing to make such concessions (despite having been offered a better resolution with respect to nude images previously) in light of the Court's continuing enforcement authority through its contempt powers and the undersigned's willingness to continue to represent him for enforcement purposes. *Id.* at ¶ 43.

38. Given that the parties specifically discussed the consent order or judgment in chambers with the Court, discussed the issue of attorneys' fees as well, and that Defendants sent counsel to chambers to represent them related to the status of settlement discussions, Derby reasonably relied on the authority the Defendants' counsel had to agree to a settlement. *Id.* at ¶ 44.

39. There is no doubt that the parties agreed to a settlement, and agreed to the placement of that settlement into the record. *Id.* at ¶ 45. However, Defendants now say that their counsel did not inform them that the settlement thereafter be embodied in a court order, despite having agreed to that very thing with respect to the resolution of most of Derby's claims at mediation.

40. Given the extensive discussions regarding settlement between counsel for Defendants and the undersigned, and given Defendants' counsels' statements to the Court in chambers, Derby believes that the parties reached an enforceable settlement, and that the Court should find that such a settlement was reached.

WHEREFORE, Derby moves this Court for an order enforcing the settlement as set forth in paragraph 35 of this motion, for entry of a consent decree ordering that the Defendants cause

SORTS to comply with the settlement and specific resolutions of Derby's requests agreed to by the parties in paragraph 22 of the Joint Stipulation and paragraph 35 of this motion, and for such further and other relief the Court deems appropriate.

        Respectfully submitted,

        BECKEMEIER LEMOINE LAW

        /s/ *Bryan LeMoine*
        Bryan LeMoine, #49784
        13421 Manchester Road, Suite 103
        St. Louis, MO 63131
        (314) 965 2277 Main
        (314) 720 8940 Direct/Fax
        bryan@bl-stl.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2022, the foregoing was filed electronically via the Court's electronic filing system and was served by operation of the CM-ECF system on all counsel of record.

        /s/ *Bryan LeMoine*