UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ADAM DERBY,                              )
                                         )
            Plaintiff(s),                )
                                         )
      v.                                 )          Case No.  4:19-cv-02271-SRC
                                         )
RICHARD WISKUS, et al.,                  )
                                         )
            Defendant(s).                )

## Memorandum and Order

Adam Derby claims Missouri Department of Health employees at the state sex-offender treatment facility in Farmington violated his rights under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) by denying thirty-two requests for items or accommodations related to his Wiccan religious practice.  After the Court denied Defendants' summary-judgment motion and ordered the parties to mediate, the parties resolved all but five of Derby's requests for accommodation.  The Court then held a bench trial regarding the remaining requests.

After the close of evidence, the parties engaged in settlement discussions—including an off-the-record in-chambers discussion regarding attorney's fees and enforcement of the settlement—and then notified the Court that they had reached a settlement.  When Derby's counsel recited in open court the same settlement terms counsel discussed with the Court in chambers, Defendants' counsel objected, claiming that it was "just now hitting [her]" what the parties' discussion in chambers meant, and that while the parties "did mention judgment," she "wasn't thinking consent judgment."  Doc. 142-3 at p. 3.  Following the trial, Derby filed a motion to enforce settlement, claiming that the parties had reached a settlement during the trial.

Doc. 138.  Defendants only dispute whether the parties reached an agreement regarding the issue of enforcement.  *See* Doc. 142.  The Court here addresses the motion.

## I.      Background

Derby is currently an involuntarily detained resident in the custody of the Missouri Department of Mental Health at the "SORTS" facility (which stands for Southeast Missouri Mental Health Center–Sex Offender Rehabilitation Treatment Services) located in Farmington, Missouri.  Doc. 72 at p. 3.  Derby is a Wicca practitioner and the high priest of the Wiccan coven at the SORTS facility.  *Id.*  Defendants are current and former SORTS employees.  Doc. 110 at ¶¶ 3–9.

In his Second Amended Complaint, Derby identified thirty-two requests for accommodation relating to his practice of Wicca.  Doc. 18.  He claims that the Defendants' denial of these requests violated his rights under RLUIPA.  *Id.*  Derby requested accommodations for items including:  wands, a wooden athame (a ritual dagger), idols/statues, robes, bigger chalices, books, wine for consumption on Sabbats, dream catchers, rugs, bracelets with charms, rings with religious symbols and stones, tea light candles, food for Sabbats, larger altar cloths, altars, pentacle plates, pipes, musical instruments, and Ouija or spirit boards.  Doc. 110 at ¶ 18.  He also requested accommodations for religious practices, including:  religious ceremonies "on the day of our holidays," nighttime full moon and "Sabot" (also spelled "Sabbat") ceremonies, what he claims are "non-sexual" nude images, open-flame fires, three hours of time on Sabbats, tattoos, "smudging" personal religious items, access to late-night news programs, foreign languages, religious oils, face painting, time outside daily, and a room for personal religious practice.  Doc. 110 at ¶ 19.  Defendants do not dispute that they denied these requests.  Doc. 110 at ¶ 17.

Following the Court's Memorandum and Order denying Defendants' summary-judgment motion, the Court appointed counsel for Derby and ordered the parties to mediate in person at the SORTS facility.  Doc. 73.  At the mediation, the parties resolved all but five of Derby's requests. As part of that resolution, the Defendants agreed to provide the following accommodations to Wiccans at SORTS, effective immediately:

- The SORTS facility will provide Wiccans three hours, exclusive of travel time, to celebrate Samhain (a Wiccan Sabbat).
- The SORTS facility will allow Wiccans to choose three other Sabbats each year, for which they will be given one and a half hours to observe each of the Sabbats, exclusive of travel time.  Once a year, the Wiccans may request to celebrate a Sabbat inside between 7:30 p.m. and 9:00 p.m.  That request will be granted unless Defendants determine in good faith that staffing prohibits granting of the request.
- Wiccans will receive a full hour per week on the other 48 weeks of the year to practice their faith as a group, exclusive of travel time.
- Wiccans may have a personal wand that is up to 8" long, up to 1" in diameter, that is not made of crystal or metal, that will be kept in the personal sharps count and which can be checked out for personal religious use by the owner of the wand.
- Wiccans may have a total of up to 3 idols or statues in their "corporate" cabinet (a separate cabinet for Wiccans to store their items) that are no taller than 8" and weigh no more than 1 pound.  The idols or statues will not be made of plastic or metal.
- In addition to a bathrobe, Wiccans may have a personal robe of any color other than camouflage to be worn only during group religious exercise.  These robes may not have any string or belt and must be worn over clothing.  Those wearing a personal robe will be subject to a pat-down search at the discretion of SORTS staff.
- Wiccans may have a personal chalice that is no taller than 8" and weighs no more than 1 pound. It may not include components made of metal.
- Wiccans may order additional books for the corporate religious locker. Wiccans will follow the SORTS facility's procedures for ordering corporate religious property, including the requirement that the cost of orders may not exceed the group's budget.  SORTS will not require the Wiccans to go through the library to order these additional books.
- The SORTS facility will purchase a paper replica of a bonfire for use by Wiccans during religious services and to be kept in the corporate locker.
- The SORTS facility will provide grape juice and a cracker for each participant in group religious practice on the Sabbats.
- Wiccans may each have a personal rug that is not larger than 28" by 40," that may only be used during personal religious practice, and must be rolled away

3

and stored at all other times.  There is no restriction on the color of the rug except it may not be camouflage.

- Wiccans may bring up to two personal religious items at a time to group religious exercise for smudging.  These items will be subject to search at the discretion of SORTS staff.
- Wiccans may have up to five tea light LED candles at a time for personal use.
- Wiccans may have altar cloths for corporate religious practice (up to 36" by 40").  There is no restriction on the color of the altar cloth except it may not be camouflage.
- Wiccans may have up to 4 bottles (of no more than 8 oz. each) of religious oils in the corporate religious locker.  All such types of religious oils will have to be approved by SORTS.
- Wiccans may have a pentacle plate for personal use that is no more than 4" in diameter, weighs less than 1/2 pound, and is not made of metal, wood, stone, glass, or plastic.
- Wiccans may have a 9" pipe to be kept in the corporate locker and each Wiccan may have a pipe for personal use of no more than 9".  Pipes may not be used to smoke tobacco.

Doc. 110 at ¶ 21 (the Court quotes the parties' list verbatim, with the exception of parentheticals the Court added).  Five of Derby's requests for accommodation remained at issue following mediation:

- Access to materials related to his Wiccan faith, such as tarot cards and Gerald Gardner's *The Witches' Bible*, that contain what Derby asserts are non-sexual nude images;
- The ability to paint his face in part during religious ceremonies;
- The ability to possess materials containing, and the ability to learn, non-English languages;
- Personal use of religious oils; and
- Time outside every day irrespective of temperature extremes.

Doc. 110 at ¶ 24.  Although the parties continued to engage in settlement discussions before trial, they failed to resolve these five issues, or the issue of attorney's fees.  Doc. 138-1 at ¶ 16.

The Court held a two-day bench trial on September 26 and 27, 2022.  Docs. 126, 127. After the close of evidence, the Court encouraged the parties to meet and confer again and attempt to settle the remaining issues.  Doc. 138-1 at ¶ 17; Doc. 142 at p. 2.  Counsel for the parties met and conferred on September 26, 2022, and again on the morning of September 27,

2022.  Doc. 138-1 at ¶¶ 18–20.  The Court requested that counsel for the parties meet in chambers around noon on September 27 to discuss the progress of the parties' settlement discussions.  In chambers, counsel reported that they were close to reaching a settlement, and an off-the-record discussion regarding attorney's fees and enforcement of the settlement occurred. The Court and the parties discussed that, as part of the judgment, the Court (1) would retain jurisdiction to enforce the settlement and address enforcement disputes that might arise, (2) would require counsel to meet and confer before filing any enforcement motions, and (3) would appoint LeMoine to continue on as counsel for Derby regarding any enforcement issues.

After the discussion in chambers, counsel for the parties continued to work to resolve the remaining issues.  Doc. 138-1 at ¶¶ 33–39.  The parties do not dispute that they agreed to the following terms:

- Defendants would cause SORTS to revert back to its prior policy related to Mr. Derby's ability to go outside using his yard pass, which was that he was allowed to go outside unsupervised in accordance with his yard pass requirements subject to the nurse's discretion to prevent him from going outside due to severe weather or inappropriate dress.
- Defendants would cause SORTS to obtain some amount of three of four religious oils approved by Defendants for the Wiccans' corporate locker/cabinet/tote to be in the custody of the nurse at SORTS.  Mr. Derby could go to the nurse to obtain a drop of the oils to use for cleansing himself prior to performing personal or individual ritual.
- Defendants would cause SORTS to allow Mr. Derby to paint his face using SORTS-approved makeup during two corporate Wiccan services per year.  The makeup would have to be applied and removed outside and Mr. Derby would receive no additional time to put on or remove makeup.  Mr. Derby would have to apply his own makeup and could not apply another SORTS' resident's makeup. The makeup could be purchased by the Wiccan group using their budget.  No mirror would be provided to the Wiccans for application of the makeup.  The makeup would remain in the Wiccans' corporate locker/cabinet/tote.
- Defendants would cause SORTS to allow Mr. Derby to obtain books to be kept in the Wiccans' corporate locker/cabinet/tote (which books cannot be checked out) which would teach Mr. Derby a foreign language.  Mr. Derby could only use the books during corporate religious services and could only speak foreign languages during corporate religious services.

- Defendants could cause SORTS to allow Mr. Derby to obtain a tarot deck of
  his choosing and substitute cards within the tarot deck containing nude images
  with other cards that did not contain nude images.  SORTS agreed that it would
  purchase said decks and approve the substituted tarot cards in the deck that Mr.
  Derby requested.

Doc. 138-1 at ¶ 40; Doc. 142 at p. 2.

The parties only dispute whether they agreed on the issue of enforcement.  Derby claims

that the parties agreed to the following:

- Mr. Derby retained the right to seek prevailing party attorney's fees, [Mr.
  LeMoine] would stay on as counsel for Mr. Derby for enforcement purposes,
  the settlement would be embodied in a Court order, and the Court would retain
  jurisdiction for enforcement purposes.

Doc. 138-1 at ¶ 40(f).  Defendants claim that the parties failed to reach an agreement on the

enforcement issue.  Doc. 142 at pp. 5–6.

After receiving notice that the parties had in fact reached an agreement, the Court

resumed proceedings on the afternoon of September 27, 2022, and the following discussion took

place:

> THE COURT:  Good afternoon, everyone.  We are here in the case of Derby v.
> Wiskus, Case No. 4:19-CV-2271-SRC.  We are here for the second day of trial and
> closing arguments, but I understand the parties have an announcement.  Is that
> correct, Mr. LeMoine?
>
> MR. LEMOINE [Counsel for Derby]:  That's correct, Your Honor.
>
> THE COURT:  All right. You may proceed.
>
> MR. LEMOINE:  The parties have reached a resolution of this case.  The parties
> are going to put that resolution into the record, just for purposes of making sure that
> we are all clear about what that resolution is, and then we would ask leave of Court
> to file a joint stipulation for a consent judgment not later than Friday for entry by
> the Court.
>
> THE COURT:  Very good. Before you do, let me check with Defendant's counsel.
> Ms. Harris, you look like you have something you want to say.
>
> MS. HARRIS [Counsel for Defendants]:  I'm not sure about the term "consent
> judgment."  That's the first time we've talked about that. I may need to run that by

6

one more person.   We had talked about settlement and the dismissal is my understanding, so . . .

**MR. LEMOINE:**  Okay.  I thought we talked about it in chambers, but that's okay.

**MS. HARRIS:**  Well, I mean, we did mention judgment.  I guess, I'm sorry, I wasn't thinking consent judgment.  I'm not sure I can agree to a consent judgment.  And I apologize for the lateness of bringing this up, but . . .

**MR. LEMOINE:**  Okay. I apologize, Your Honor.  I -- I'm not sure how the Court enforces settlement without a judgment.  I just don't know how the Court retains continuing jurisdiction over the matter and does what we discussed in chambers, which is a meet-and-confer process before attempting to enforce the order or judgment.

**MS. HARRIS:**  I do apologize.  But I -- I do not at this point have -- I recognize what we said in chambers and it's just now hitting me what that meant.  And I don't -- I don't have authority to enter into a consent judgment at this point.  I need to make one more call.  And I apologize to the Court.

Doc. 142-3 at pp. 2:3–3:16.  After a temporary recess, the discussion continued:

**MR. LEMOINE:**  As the Court is aware, we have had settlement discussions.  And the settlement discussions that we had at mediation resulted in a joint stipulation filed with the Court.  With respect to 17 of 25 of the requested accommodations, we believe that we have resolved the remaining five that were set for trial.

I thought that we had an agreement that the Court would enter a judgment and retain jurisdiction over the judgment.  It sounds now that the defendants are willing to enter into a settlement agreement with the dismissal with prejudice and agree that the Court would retain jurisdiction over that settlement agreement.

And from my perspective, that forecloses any ability for Plaintiff to request his attorney's fees once we dismiss it with prejudice.  I haven't done the research, but that's my instinct.  And I'm not sure what the Court's position would be on retaining jurisdiction over a settlement agreement.  The parties could certainly include within the settlement agreement a meet-and-confer obligation, if the Court was willing to retain jurisdiction and monitor compliance with the settlement agreement for a period of time.

**MS. HARRIS:** I am not positive that my client will agree to all of that either. I'm getting indications --

**MR. LEMOINE:**  Well, I'm not sure what we talked about in chambers.  I'm sorry, Your Honor. I just don't know what happened here.

**THE COURT:**  We are kind of [i]n different universes now.  What's happened?

**MS. HARRIS:**  I apologize.  Again, I thought we were talking about if a settlement -- and if we reached a settlement we would have like a different action to bring.  I had -- did not recognize we were talking about continued monitoring by the Court to any consent decree.

**THE COURT:**  That's exactly what I said, though. I said I would retain . . . continuing jurisdiction. . . . I want to make sure the record is clear.  The conversation we had in chambers -- I will put that on the record -- was that I said I normally don't retain continuing jurisdiction over cases.

However, I said there are two situations where I do:  Number one is where I'm required to; and number two is where there are exceptional reasons for doing so. And I said this is a case of exceptional reasons and I would retain continuing jurisdiction.  I would order the parties to meet and confer to discuss any disputes or issues with respect to compliance with the settlement before they came to me on anything and I said that I was able to provide compensation out of court funds for Mr. LeMoine to remain as counsel if I ordered him to do so to deal with the enforcement going forward.

So I'm not sure how there could have been anything unclear about that, but that's what I said.

**MS. HARRIS:**  It is what you said.  And I don't know how I missed it either.  If that's what the Court is going to order, that's fine.

Doc. 142-3 at pp. 4:6–6:12.

Denise Thomas, the general counsel for the Missouri Department of Mental Health, also addressed the Court, explaining that "[i]t has long been the position of state agencies, including the Department of Mental Health, that we do not agree to consent judgments," and that the Department "would not have agreed to a consent judgment" here.  Doc. 142-3 at pp. 6:13–7:10. The Court noted the apparent disconnect between the Department's counsel and counsel of record in the case; however, counsel for both sides agreed with the Court that "there was nothing unclear" about the discussion in chambers.  *Id.* at p. 7:11–24.  Following another recess, the following discussion occurred:

**MS. HARRIS:**  Your Honor, I do not believe we reached a settlement agreement unlike what we talked about. Today prior to us going into chambers there was no discussion about enforcement of the settlement of the resolution that we were talking about. There should have been. That's my fault.

I should have recognized that that was something we needed to discuss because after we mediated it and reached the agreement on the first 17 issues, there was discussion about it. We were unable to reach an agreement at that point and so we put that in our stipulation to you to become part of the judgment on this Court on the last five issues that you were going to be hearing. I should have recognized that that was an issue important in this. I did not. Neither [co-counsel]Ashley [Ray] nor I discussed with our client any sort of enforcement proceedings, how this would go, how it would be enforced at any point today prior to us going on the record the last time.

In the chambers, I recall -- this is my recollection -- I recall you, after being told we were nearing resolution, asking Mr. LeMoine what enforcement mechanisms Mr. Derby would have. My recollection is that Mr. LeMoine said that Mr. Derby would have the normal or typical, I don't remember the exact word he used, enforcement mechanisms with any judgment. I recognize now he used "judgment" and not "settlement" but he said judgment. I did not really recognize that at the time.

I do not recall anyone ever using, at any point today prior to us going on the record the last time, the words "consent judgment" or "consent decree." I thought at the time what [Mr. LeMoine] was referring to was a normal enforcement of a settlement agreement which would be through a new action for a breach of contract. It's my fault because clearly he said "judgment."

Clearly, then, you went to work on -- or you all talked about the fact that if Bryan [LeMoine] would agree to stay on the case, he could possibly get paid. You also indicated that you would order a meet-and-confer before you would do anything. I should have recognized that you were talking about the same case and not some new case. I did not. It's totally on me. I recognize that. It's a mistake on my part about exactly what was being discussed.

I am hopeful that you will note that as soon as Bryan [LeMoine] said the words "consent judgment" or "decree," whichever one -- I don't recall -- he noted, I immediately responded. That's a red line for us that I noted and immediately stood up and said we haven't agreed to that. I don't have that authority.

I'm hopeful that it's some evidence that prior to him seeing [sic] those words here I had no idea that that's what we were talking about. I had clearly not discussed that with my client, as Ms. Thomas said.

My client is not in agreement to enter into any sort of consent decree or consent settlement and that's because of me, my own ignorance, my not understanding what we were fully talking about when we were in your chambers, which is, again, the first time that the enforcement mechanism was discussed. I believe the only time, honestly, it was discussed today before we last went on.

Doc. 142-3 at pp. 8:7–10:18.  Derby's counsel responded:

9

**MR. LEMOINE:** I'm sorry, Judge. I'm sort of at a loss for words, which I know is unusual for a lawyer anytime anywhere. What I -- what I would say for the record is this, perhaps with respect to a motion to enforce. I made clear throughout, since getting into this case and after the mediation, that I was very concerned about the enforcement mechanism. I thought that a state court breach of contract action would be insufficient to remedy a failure by the Department of Mental Health and specifically the defendants to abide by their obligations in a settlement.

And the reason that I believed that was because I was appointed in this case, and I would not be present and representing Mr. Derby in a state court case absent my own choice. Not saying I wouldn't, but I'm just saying I would not be.

And so I expressed that concern very clearly. We entered a joint stipulation that was filed with the Court with respect to 17 of the 25 issues that were resolved at mediation and held over for trial five issues.

I don't believe there should have been any surprise, especially given our conversation in chambers, that the resolution was going to be something that would be enforced by the Court. We talked about it specifically.

I also recognize that we may not have used the specific words in chambers and I may not have used specific words during discussions with them "consent decree" or "consent judgment." But I will say that during my discussions with them, and I believe in chambers, I wanted to be able to have an opportunity to file a motion for attorney's fees, and I expressed significant concern that a dismissal with prejudice without some order would foreclose that from happening.

So my view is everybody should have known that we were headed down a path towards the Court entering some order that would provide for continued jurisdiction over the resolution of these claims. I believe that can only be in the form of some sort of consent decree or a stipulation that's filed with the Court.

And as a result of that, I believe that we did reach an agreement today and I believe that we have resolved the claims and I may file, on behalf of Mr. Derby, a motion to enforce [settlement] . . . .

Doc. 142-3 at pp. 12:9–14:1. The Court added:

**THE COURT:** Let me say this: With respect to the issue of the conversation in chambers, there's no question in my mind, none, whatsoever, that you used the term "judgment," "decree" or "order," one of those three, if not two of them together. Because that is what triggered my inquiry about the enforcement mechanism. If this were just a private settlement, there would have been no reason for me to inquire about that.

And so -- you also mentioned the issue of attorney's fees, which is also what triggered me to have that discussion about enforcement. And we went further to

discuss, well, if you had an application for attorney's fees under a judgment, then you could not get compensated under -- from our court's non-appropriated fund.

And but if I were to order you to remain as counsel going forward, or if you were willing to agree to, which you said you were, then I could compensate you going forward out of the court's non-appropriated fund.  But on the backside you couldn't do both.

So we -- there's no question in my mind that you said one of those terms -- judgment, decree or order.  There's no question in my mind that that is what triggered me to get into the discussion about enforcement, about attorney's fees, about going backwards, going forwards, how that might work in terms of fees and you staying in the case.

So how that gets sorted out, however, is not an issue for me to decide today.  And, you know, if there's a motion to enforce settlement, I [will] deal with it then.

Doc. 142-3 at pp. 14:7–15:9.

The Court then heard closing arguments and took the case under advisement.  Doc. 127.

While the case remained under advisement, Derby filed a motion to enforce settlement, which is

now fully briefed and ready for the Court's consideration.  Docs. 138, 139, 142, 143.

**II.     Standard**

"Sitting in diversity, [federal courts] apply the substantive law of the applicable state."

*Aragon v. Wal-Mart Stores E., LP*, 735 F.3d 807, 809 (8th Cir. 2013) (citation omitted).  The

parties agree that Missouri law applies to the present motion.  *See* Doc. 139 at p. 5; Doc. 142 at

p. 3.

In Missouri, "[a] motion to enforce a settlement adds to the underlying case a collateral

action seeking specific performance of the agreement."  *Eaton v. Mallinckrodt, Inc.*, 224 S.W.3d

596, 599 (Mo. 2007) (citation omitted).  "[A] district court has inherent power to enforce a

settlement agreement as a matter of law when the terms are unambiguous."  *Barry v. Barry*, 172

F.3d 1011, 1013 (8th Cir. 1999) (citing *Gatz v. Sw. Bank of Omaha*, 836 F.2d 1089, 1095 (8th

Cir. 1988)).  Before the Court will order specific performance, the moving party must present

"clear, convincing and satisfactory" evidence that an agreement existed. *Visiting Nurse Ass'n, St. Louis v. VNAHealthcare, Inc.*, 347 F.3d 1052, 1053 (8th Cir. 2003) (first citing *Randall v. Harmon*, 761 S.W.2d 278, 278 (Mo. Ct. App. 1988); then citing *Stewart v. M.D.F., Inc.*, 83 F.3d 247, 251–52 (8th Cir. 1996)). "Evidence is clear and convincing if it instantly tilts the scales in the affirmative when weighed against the evidence in opposition, such that the fact finder's mind is left with an abiding conviction that the evidence is true." *Grant v. Sears*, 379 S.W.3d 905, 915 (Mo. Ct. App. 2012) (cleaned up) (quoting *Reppy v. Winters*, 351 S.W.3d 717, 720 (Mo. Ct. App. 2011)).

"[A] district court has considerable discretion in determining the procedure appropriate to a motion to compel settlement," and only needs to hold a hearing "if there are substantial questions of fact that are not already a matter of record." *Barry*, 172 F.3d at 1013  (citing *Stewart*, 83 F.3d at 251). "When a motion is based on facts not appearing of record, Fed. R. Civ. P. 43[(c)] provides that a district court 'may hear the matter on affidavits presented by the respective parties,' or 'may direct that the matter be heard wholly or partly on oral testimony or deposition.'" *Stewart*, 83 F.3d at 251. "This rule invests the district court with considerable discretion to tailor the proceedings to the practical realities surrounding the particular motion." *Id.*

## III.    Discussion

Derby moves to enforce a settlement he claims the parties reached during trial.  Doc. 139 at p. 1.  Both sides attached affidavits to their motion-to-enforce-settlement briefs, and neither Derby nor the Defendants requested an evidentiary hearing.

"Basic principles of contract formation govern the existence and enforcement of [an] alleged settlement." *Chaganti & Assocs., P.C. v. Nowotny*, 470 F.3d 1215, 1221 (8th Cir. 2006)

(first citing *In re Airline Ticket Comm'n Antitrust Litig.*, 268 F.3d 619, 623 (8th Cir. 2001); then citing *Sheng v. Starkey Lab'ys, Inc.*, 53 F.3d 192, 194 (8th Cir. 1995)); *see also Randall v. Harmon*, 761 S.W.2d 278, 279 (Mo. Ct. App. 1988) (noting that "[a] compromise settlement is a contract," and "must possess the essential elements of any other contract" (citations omitted)).

"Under Missouri law, the essential elements of a contract are: (1) competency of the parties to contract; (2) subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation." *Bldg. Erection Servs. Co. v. Plastic Sales & Mfg. Co.*, 163 S.W.3d 472, 477 (Mo. Ct. App. 2005), *as modified* (May 31, 2005) (citing *Ketcherside v. McLane*, 118 S.W.3d 631, 635 (Mo. Ct. App. 2003)).  As explained below, only the mutuality-of-agreement element is at issue here.

### A.      Competency, subject matter, consideration, and mutuality of obligation

As an initial matter, the record lacks any indication that the parties are not competent to contract, and the subject matter—the resolution of pending litigation—is proper.  *See id.* Additionally, the parties do not dispute that according to the terms of the settlement, Defendants would accommodate some, but not all, of Derby's requests for accommodation—satisfying the elements of consideration and mutuality of obligation.  *See* Doc. 138-1 at ¶ 40–42; *Chaganti*, 470 F.3d at 1221 ("Consideration exists when there is a detriment to the promisee or a benefit to the promisor, and mutuality of obligation exists whenever there is consideration." (first citing *State ex rel. Citibank (S. Dakota), N.A. v. Wilson*, 160 S.W.3d 810, 813 (Mo. Ct. App. 2005), then citing *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 859 (Mo. 2006))).

### B.      Mutuality of agreement

"The term 'mutuality of agreement' implies a mutuality of assent or a meeting of the minds to the essential terms of a contract." *Ketcherside*, 118 S.W.3d at 635 (first citing *Smith v.*

*Hammons*, 63 S.W.3d 320, 325 (Mo. Ct. App. 2002); then citing *Baris v. Layton*, 43 S.W.3d 390, 396 (Mo. Ct. App. 2001)).  The Eighth Circuit has noted that "despite its capacity to confuse," the phrase "meeting of the minds . . . has proved difficult to eradicate from discussions of contract law." *Visiting Nurse Ass'n*, 347 F.3d at 1054.  "On its face, it can create the impression that a contract is formed only when the parties to it entertain the same subjective views as to its meaning.  That, however, is not the law." *Id.* (citation omitted).  "Rather, a court looks to the parties' objective manifestations of intent and interprets those manifestations as a reasonable person would." *Id.* (citing *McDaniel v. Park Place Care Ctr., Inc.*, 918 S.W.2d 820, 827 (Mo. Ct. App. 1996)).  "If those manifestations produce a reasonably ascertainable objective meaning, an enforceable agreement exists." *Id.*; *see also Computer Network, Ltd. v. Purcell Tire & Rubber Co.*, 747 S.W.2d 669, 675 (Mo. Ct. App. 1988) (noting that Missouri has followed the "objective theory of contracts" for more than a century (citing *Brewington v. Mesker*, 51 Mo. App. 348, 356 (1892))).  Thus, "[t]he making of a contract does not depend upon the state of the parties' minds; it depends on their overt acts." *Newman v. Schiff*, 778 F.2d 460, 464 (8th Cir. 1985) (quotation marks omitted).

Derby argues that the parties reached an agreement on all essential terms of their settlement, including the issue of enforcement.  Doc. 139 at pp. 6–10.  Defendants agree that the enforcement provision is an essential term of the settlement, but dispute whether mutuality of agreement existed between the parties on that term.  *See* Doc. 139 at p. 7; Doc. 142 at p. 5.

First, Derby relies on the fact that the enforcement provision was a key part of the settlement discussions, including during the discussion between the parties and the Court in chambers immediately before the parties reached the final agreement.  Doc. 139 at pp. 8–9. Second, Derby points out that the Court stated on the record that during the conversation in

14

chambers, the parties clearly contemplated that their settlement agreement would be put on the record and incorporated into an order, that the Court would maintain jurisdiction over the settlement, and that Derby's counsel would continue to represent Derby during any subsequent enforcement proceedings. *Id.* at p. 9; *see* Doc. 142-3 at pp. 14:7–15:9. Derby also points out that counsel for Defendants acknowledged that there was "nothing unclear" about the discussion in chambers about enforcement and stated "if that's what the Court is going to order, that's fine." Doc. 142-3 at pp. 4:6–6:12; 7:20–24. Third, Derby argues that the parties agreed that "Derby's counsel would seek attorneys' fees by motion to the Court," and negotiated their settlement with the understanding that Derby needed to be a prevailing party for his counsel to obtain attorney's fees. Doc. 139 at pp. 9–10.

Defendants make two arguments in response. First, Defendants rely on the fact that the parties had been unable to resolve the issue of enforcement before trial. Doc. 142 at pp. 5–6. Defendants provide an email that counsel for Defendants sent to Derby's counsel on August 4, 2022, stating "if the continued court jurisdiction is a requirement, we may be at an impasse." Doc. 142-1 at p. 3. But while relevant, the August 4, 2022 email merely reflects Defendants' position before the Court's pre-trial rulings excluding many of Defendants' witnesses, and before the close of trial testimony. The Court notes that Defendants did not agree to resolve *any* of Derby's claims until after the Court denied Defendants' summary-judgment motion and ordered the parties to mediate; further, Defendants do not dispute that following the close of trial testimony, they came to an agreement with Derby regarding his five remaining requests. In light of Defendants' shifting positions as the case progressed, the August 4, 2022 email does not provide compelling evidence of Defendants' position on the enforcement issue after the close of trial testimony.

15

Relatedly, the parties also attach varying meaning to the fact that the Joint Stipulation of Facts—which, among other things, documented the parties' resolution of all but five of Derby's requests for accommodation—did not mention enforcement. *See* Doc. 110 at ¶ 21. Defendants argue that the language of the stipulation is "consistent with Defendants' understanding that any dispute over a violation of the agreed-upon accommodations would not be raised in federal court." Doc. 142 at pp. 5–6. However, as Derby points out, counsel for Defendants acknowledged at trial that although the parties discussed the enforcement issue at mediation, they were "were unable to reach an agreement at that point," and intended for the stipulation to become part of the Court's judgment on the last five issues remaining for trial. Doc. 143 at p. 2 (citing Doc. 142-3 at 8:15–20). Ultimately, like the email, the Joint Stipulation's silence on the question of enforcement merely shows that the parties failed to reach an agreement on that issue before trial. For these reasons, the Court finds Defendants' first argument unpersuasive.

Second, Defendants rely on the fact that counsel for Defendants "immediately objected" when Derby's counsel reported that the parties had agreed to incorporate their settlement into a joint stipulation for a consent judgment. Doc. 142 at p. 7. But while the objection may provide evidence of counsel for Defendants' state of mind during the settlement discussion, "[t]he making of a contract does not depend upon the state of the parties' minds; it depends on their overt acts." *Newman*, 778 F.2d at 464. Further, counsel for Defendants admitted that "there was nothing unclear" about the discussion in chambers, and she acknowledged that she should have realized the significance of the use of the word "judgment" during the discussion in chambers regarding the enforcement issue. Doc. 142-3 at p. 7:20–22. Thus, Defendants' second argument also lacks merit.

16

In sum, the Court finds that Derby has met his burden to show by a clear and convincing evidence that the parties agreed to a settlement that included the enforcement provision as discussed in chambers.  Indeed, the Court has no doubt of this.

C.     **Statute of frauds**

Although neither party addresses the issue, the Court is mindful of Missouri's statute of frauds, which provides in relevant part:

> No action shall be brought . . . upon any agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person by him thereto lawfully authorized . . . .

Mo. Rev. Stat. § 432.010.

"A settlement contract need not be written for efficacy unless the subject matter of the compromise falls within the Statute of Frauds.  In that determination, the intended effect of the compromise, and not the nature of the antecedent claim governs the applicability of the Statute of Frauds." *Jackson v. Shain*, 619 S.W.2d 860, 862 (Mo. Ct. App. 1981) (citing *DeWitt v. Lutes*, 581 S.W.2d 941, 945 (Mo. Ct. App. 1979)).  "The longstanding interpretation of the one year provision in this statute of frauds is that an oral contract for a definite period of time exceeding one year falls within the statute and is unenforceable unless some written memorandum sufficiently documents the contract to take it outside the statute of frauds." *Vess Beverages, Inc. v. Paddington Corp.*, 886 F.2d 208, 212 (8th Cir. 1989) (citing *Int'l Plastics Dev., Inc. v. Monsanto Co.*, 433 S.W.2d 291, 292–93 (Mo. 1968); *Blue Valley Creamery Co. v. Consol. Prods. Co.*, 81 F.2d 182, 184 (8th Cir. 1936) (interpreting Missouri law)).

But even if the parties' purported settlement agreement implicates the statute of frauds, according to the Supreme Court of Missouri, "[t]he rule has always been that the operation of the statute of frauds can be waived." *Barr v. Snyder*, 294 S.W.2d 4, 10 (Mo. 1956).  Here, as in

17

*Barr*, both sides introduced evidence regarding the issue of whether an enforceable oral contract existed, and Defendants did not raise the statute of frauds during the discussion at trial or in their briefing on the motion to enforce settlement.  Accordingly, the Court finds that Defendants waived any statute-of-frauds defense here.  *See id.*

      **D.**      **Authority to settle the case**

      "[A]n attorney is presumed to possess authority to act on behalf of the client," although "a judgment entered upon an agreement by the attorney may be set aside on affirmative proof that the attorney had no right to consent to its entry."  *Surety Ins. Co. v. Williams*, 729 F.2d 581, 582 (8th Cir. 1984).  "Once it is shown . . . that an attorney has entered into an agreement to settle a case, the party who denies that the attorney was authorized to enter into the settlement has the burden to prove that authorization was not given."  *Greater Kansas City Laborers Pension Fund v. Paramount Indus., Inc.*, 829 F.2d 644, 645 (8th Cir. 1987) (citing *Turner v. Burlington N. R.R. Co.*, 771 F.2d 341, 345 (8th Cir. 1985)). "This is a heavy burden."  *Id.* (citing *Turner*, 771 F.2d at 345).

      The Court notes that during the discussion at trial about settlement, the General Counsel for the Missouri Department of Health addressed the Court, stating that "[i]t has long been the position of state agencies, including the Department of Mental Health, that we do not agree to consent judgments," and that the Department "would not have agreed to a consent judgment" here.  *See* Doc. 142-3 at pp. 6:13–7:10.  Although Derby briefed the issue of authority, *see* Doc. 139 at pp. 11–13, Defendants did not introduce affidavits or request an evidentiary hearing on the issue and did not address it anywhere in their response to Derby's motion to enforce, *see generally* Doc. 142.  The Court agrees with Derby that counsel for Defendants represented that she had authority to settle the case; thus, the presumption of authority to settle the case applies,

and as Defendants fail to make any argument whatsoever regarding the issue of authority, the Court need not address it further.

### D.      The Court's role

While no party raised the issue of whether the Court must, or should, recuse, given the Court's firsthand knowledge of the off-the-record settlement discussion, the Court raises it *sua sponte* out of an abundance of caution.  The Court carefully analyzed 28 U.S.C. § 455 and the Code of Conduct for United States Judges, particularly Canons 3C and 3D.  In short, because the parties do not dispute either the conversation that occurred in chambers or the Court's on-the-record recitation of that conversation, the Court does not have personal knowledge of disputed evidentiary facts and therefore is not likely to be a material witness in the proceeding.  Further, the Court only obtained information regarding the settlement in its judicial capacity.  No basis exists for disqualification.  *See* 28 U.S.C. § 455; Canon 3C and 3D of the Code of Conduct for United States Judges; *Matter of Snyder*, 734 F.2d 334, 343 (8th Cir. 1984), *rev'd sub nom. on other grounds In re Snyder*, 472 U.S. 634 (1985); *Hale v. Firestone Tire & Rubber Co.*, 756 F.2d 1322, 1329 (8th Cir. 1985).

### E.      Enforcement of the settlement agreement

As mentioned, "a district court has inherent power to enforce a settlement agreement as a matter of law when the terms are unambiguous.  *Barry*, 172 F.3d at 1013 (citing *Gatz*, 836 F.2d at 1095).  Other than the issue of enforcement, the parties do not dispute the terms of the settlement agreement.  *See* Doc. 110 at ¶ 21; Doc. 138-1 at ¶ 40; Doc. 142 at p. 2.  As to enforcement, the Court agrees with Derby that the parties agreed that "Mr. Derby retained the right to seek prevailing party attorney's fees, [Mr. LeMoine] would stay on as counsel for Mr. Derby for enforcement purposes, the settlement would be embodied in a Court order, and the

Court would retain jurisdiction for enforcement purposes." Doc. 138-1 at ¶ 40(f).  The Court

finds this term is unambiguous; accordingly, the Court may enforce the settlement agreement.

**IV.     Conclusion**

The Court grants Derby's [138] Motion to Enforce Settlement.  The Court orders the

parties to file a joint stipulation for a consent judgment by no later than February 13, 2023,

incorporating the terms the parties agree on, *see* Doc. 110 at ¶ 21; Doc. 138-1 at ¶ 40; Doc. 142

at p. 2, as well as the enforcement term as stated above, *see supra* Section III.E.  The Court

denies as moot [144] Defendants' Motion to Stay Plaintiff's Motion to Enforce Settlement.

So Ordered this 3rd day of February 2023.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE